FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   JAN 2 7 2022   ★

BROOKLYN OFFICE

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| [UNDER SEAL], | |
| **Plaintiff,** | CV22- 501 |
| **COMPLAINT** -against- | **CIVIL CASE NO.** |
| | **FILED *IN CAMERA* AND UNDER SEAL**     **ROSS, J.** |
| | **Jury Trial Demanded**     **CHO, M.J.** |
| [UNDER SEAL], | |
| **Defendants.** | |

## FALSE CLAIMS ACT COMPLAINT

# DO NOT FILE ON PACER

1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF NEW YORK, *ex rel.* DONG IN KANG,<br><br>Plaintiff-Relator,<br><br>-against-<br><br>SUNRISE SENIOR SERVICE LLC, SEOKJAE YANG, KANGSAN LEE, KANGSAN CONSULTING LLC, JIEUN OH, TAEYOUNG SONG, MY HOPE PHARMACY LLC, ELEMENTS PHARMACY INC., ROYAL CARE DRUGS INC., DOREMI, INC., MINHO NAMGUNG, TAO CHEN, SHEN HAN LIN, D.O., SR HOMECARE OF NY, INC., HUMAN CARE, LLC, ELIM HOME CARE AGENCY LLC, HELP HOME CARE AGENCY LLC, and X-TREME CARE, LLC,<br><br>Defendants. | ECF Case<br><br>COMPLAINT<br><br>Jury Trial Demanded |

*Qui Tam* Plaintiff/Relator Dong in Kang ("Kang") ("Plaintiff" or "Relator"), brings this action against Sunrise Senior Service LLC ("Sunrise"), Seokjae Yang ("Yang"), Kangsan Lee ("Lee"), Kangsan Consulting LLC ("KC"), Jieun Oh ("Oh"), Taeyoung Song ("Song" and, together with Sunrise, Yang, Lee, KC, and Oh, "Sunrise Defendants"), My Hope Pharmacy LLC ("My Hope"), Elements Pharmacy Inc. ("Elements"), Royal Care Drugs Inc. ("Royal"), Doremi, Inc. ("Doremi"), Minho Namgnug ("Victor"), Tao Chen ("Chen" and, together with My Hope, Elements, Royal, Doremi, and Victor, "Pharmacies"), Shen Han Lin, D.O. ("Dr. Lin"), SR

2

Homecare of NY, Inc. ("SR"), Human Care, LLC ("Human"), and Elim Home Care Agency LLC ("Elim"), Help Home Care Agency LLC ("Help") and X-Treme Care, LLC ("X-Treme", and, together with SR, Human, Elim and Help, "Homecare Agencies," and, together with Sunrise Defendants, Pharmacies and Dr. Lin, "Defendants") on behalf of the United States of America and the State of New York and alleges, based upon personal knowledge and relevant documents, as follows:

## NATURE OF THE ACTION

1.     This is an action to recover damages and civil penalties on behalf of the United States of America and the State of New York arising from false and/or fraudulent statements and claims made, used and caused to be made, used or presented by Defendants and/or their agents and employees in violation of the Federal Civil False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.* and the New York State False Claims Act ("NY FCA"), NY Fin. Law, ch. 13 §§ 187, *et seq.* for false claims that Defendants presented to state and federal Medicare and Medicaid, federal healthcare programs, as defined in 42 U.S.C. § 1320a-7b(f), including but not limited to Managed Long Term Care ("MLTC") plans run by the New York Medicaid program.

2.     These claims are based on Defendants' submission of false and fraudulent claims to the United States and New York for payment of monies through Medicare and Medicaid. The monies were to be used to provide adult day care, home health aide, pharmaceuticals and other health and medical services for elderly and low-income individuals to allow these individuals, who require daily nursing assistance, to remain at home in their communities instead of entering skilled nursing or assisted living facilities. However, Defendants failed to provide the required services. Instead, Defendants recruited healthy adults ineligible for Medicaid and/or Medicare, adult day care services and/or home health aide services to enroll as adult daycare members at

Sunrise ("Members"), incentivizing them with kickbacks to participate in Defendants' scheme to defraud the United States and New York, trained such Members on how to appear eligible for daycare, instructed them on how to falsify records to be submitted to the government setting forth that they: (1) attended daycare (which they did not); (2) were in need of certain medications (they were not); (3) took daycare transportation (they often did not); (4) required and utilized home health aides (they did not). As such, Defendants billed for the following services which were not provided or were medically unnecessary, violating the federal and New York laws and regulations:

(1) adult daycare, transportation, tele-monitoring and meal services which were never provided to Members;

(2) adult daycare services provided by unregistered daycare locations;

(3) adult daycare services provided by unlicensed and/or unqualified social workers;

(4) adult daycare services provided or purportedly provided for healthy Members ineligible for Medicaid/Medicare and/or covered services;

(5) medically unnecessary prescription medications;

(6) pharmacy "coupon" cards intended for medically unnecessary medications which were unlawfully exchanged for cash kickbacks to Members; and

(7) home health aide services which were not provided.

3. Defendants run multiple schemes to increase their revenue from Medicare and Medicaid, including:

- Recruiting healthy Members to Sunrise by providing sizeable kickbacks in exchange for participating in a scheme to defraud the government which included signing documents which indicate that Members attended Sunrise on a regular basis and took Sunrise transportation when they did not, signing up with insurance companies for pharmacy coupon cards (i.e.,"OTC Cards"), receiving

4

prescriptions for and filling medically unnecessary medications, and signing up to receive services from a home health aide through one of the Homecare Agencies and certifying services were provided when they were not;

- Training Members to provide false health and/or income information to the federal and New York State government in order to qualify for coverage for Medicaid and/or Medicare, adult daycare services, transportation and meals, prescriptions, pharmacy coupon cards ("OTC cards"), and home health aide services;

- Referring Members or potential Members to Dr. Lin or other doctors, in order to obtain false diagnoses to support the claims that Members were in need of adult daycare and prescriptions for medically unnecessary medications, including but not limited to certain gels, patches, or other pain medications, which Medicare and/or Medicaid paid a large reimbursement to the Pharmacies that filled these prescriptions;

- Referring Members to one of the Pharmacies to fill the medically unnecessary prescriptions, where the Pharmacies would receive monetary reimbursement from Medicare and/or Medicaid and would share such reimbursement with Sunrise Defendants who would in turn provide a portion to the Members;

- Help uninsured Members enroll with Empire or United Health Insurance, in order to receive monthly pharmacy cards known as "OTC cards" of either one hundred ($100.00) for Empire or one hundred and thirty dollars ($130.00) for United each and referring Members to the Pharmacies who received cash from the government and then provided one hundred dollars ($100.00) to Lee who then provided cash

5

and an additional thirty dollars ($30.00) of food credit for those with United insurance to Members through KC in exchange for such cards;

- Referring Members to one of the Homecare Agencies who receive pay from the federal and/or New York State government for services not actually provided by home health aides. Several of the Homecare Agencies used Sunrise employees as Home Health Aides ("Aides"). When this was the case Aides/Sunrise employees would pay Lee a percentage of the government monies, and Lee provides a certain amount in kickbacks to Members through KC;

- Providing kickbacks to Members for referring new Members, either on a per-member referral or monthly salary basis;

- Operating adult daycare centers at unregistered locations, even after being warned about such violated by the New York City Department for the Aging ("DFTA"); and

- Encouraging Members to use ambulette services for transportation to/from the centers but billing the government for daycare operated transportation.

4. Defendants made numerous false claims on documents submitted to Medicare and Medicaid seeking payments based on adult daycare services (including transportation and meal credits), home health aide services, or medications which were not provided, not needed, or provided at an unlicensed location, in violation of the Medicare Act, 42 U.S.C. § 1395y(a)(1)(A) (no payment for services which are not reasonable and necessary for the diagnosis or treatment of illness or injury) and a number of New York regulations, including 9 NYCRR § 6654.20.

5. In furtherance of the false claims, Defendants would provide Members with kickbacks in exchange for their cooperation, such as providing false information to the federal

and/or New York State government in order to qualify for Medicare and/or Medicaid and adult daycare services, falsifying sign-in/sign-out sheets for adult daycare services which were not provided, taking ambulette services which Members did not qualify for, paid for by the federal or New York State government, to/from Sunrise while Sunrise billed for its own transportation services, visiting Dr. Lin or other doctors to obtain false diagnoses and medically unnecessary prescriptions, filling such medically unnecessary prescriptions and cooperating with Homecare Agencies in falsifying records of home health aide services which were not provided.

6.    Relator estimates that there are approximately five hundred (500) Members currently on Defendants' roster.

7.    The majority of the Members (approximately two-thirds (2/3) of the current Members), only visit Sunrise once per month to obtain kickbacks and falsify sign-in/sign-out sheets for the month, which falsely indicate that Members attended adult daycare as authorized (typically three (3) times per week) in order for Sunrise to submit such sign-in/sign-out sheets to Medicare and/or Medicaid, and specifically MLTCs that Sunrise contracted with, such as Integra MLTC, Inc. ("Integra"), AgeWell New York ("AgeWell") or VillageCareMAX (Village Care and, together with Integra and AgeWell, the "MLTCs"), for reimbursement.

8.    Only approximately one-third (1/3) of the current Members come into Sunrise on a more regular basis simply to socialize with other Members and are not in need of nor do they receive eligible or covered services.

9.    No compensable adult daycare services are provided to any Members, nor could they be, as no licensed or qualified social workers were employed by Sunrise.

10.    Sunrise Defendants continue to fully engage in the above schemes despite being warned about a member having complained about the schemes to the DFTA as set forth in the January 20, 2021 letter. *See* **Exhibit A**1.

11.    Moreover, at least one (1) of the Sunrise locations is not properly registered to provide adult daycare services, and Sunrise continues to operate the centers despite being warned about the violation by the DFTA. (*See id.*)

12.    As a result of these unlawful practices that Relator questioned and refused to condone, Relator was forced to leave his employment with Sunrise.

13.    In perpetrating the above schemes, Defendants have fraudulently obtained reimbursement from public funds.

14.    As a direct result of Defendants' improper practices, federal and state health insurance programs including, but not limited to Medicare and Medicaid, have been damaged by the monies paid for false or fraudulent claims as reimbursement for services which were not performed, or were improperly or unnecessarily performed, and which were not authorized by Medicare and Medicaid that would not have been paid but for Defendants' illegal business practices.

15.    As a direct result of Defendants' improper practices, federal and state health insurance programs including, but not limited to Medicare and Medicaid, have been damaged by the monies paid for false or fraudulent claims as reimbursement for medications which were not obtained, or were improperly or unnecessarily obtained, and which were not authorized by Medicare and Medicaid that would not have been paid but for Defendants' illegal business practices.

---

1 All exhibits referenced herein are attached to written disclosures pursuant to False Claims Act § 3730(b)(2). .

8

16. Upon information and belief, as a result of Defendants' fraudulent practices, Defendants have recovered billions of dollars. Defendants' fraudulent practices have caused great harm and expense to the federal government and the state of New York and to honest vulnerable older individuals who are receiving improper and unlawful medical care.

17. The FCA was originally enacted during the Civil War, and later substantially amended in 1986. Congress amended the FCA to enhance the Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the FCA, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or Government inaction and to encourage the private bar to commit legal resources in prosecuting fraud on the Government's behalf.

18. The FCA provides that any person who knowingly submits, or causes the submission of a false or fraudulent claim to the U.S. Government for payment or approval, is liable for a civil penalty of up to $11,000 for each such claim, plus three (3) times the amount of damages sustained by the Government. Liability attaches when a defendant knowingly seeks payment, or causes others to seek payment, from the Government that is unwarranted.

19. The FCA allows any person having information about a false or fraudulent claim against the Government to bring an action for both himself and the Government, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of sixty (60) days (without service on the defendant(s) during that time), to allow the Government time to conduct its own investigation and determine whether to join suit.

20.    Based on these provisions, *qui tam* Plaintiff/Relator seeks through this action to recover on behalf of the United States and the State of New York that authorizes similar *qui tam* actions, damages and civil penalties arising from Defendants' making or causing to be made false or fraudulent records, statements and/or claims in connection with their practice of billing Medicare and Medicaid for services, which were not provided or improperly provided or and, therefore, unauthorized by Medicare and Medicaid, or for medically unnecessary services and/or medications, often which were never provided.

21.    Relator believes this is a worthwhile claim as it is representative not only of Defendants' own fraudulent practices, but those that are currently occurring throughout the entire Korean Adult Daycare Center community in New York City.

## JURISDICTION AND VENUE

22.    The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3720. Under 31 U.S.C. § 3730(e), there has been no statutory relevant public disclosure of the "allegations or transactions" in this Complaint. Relator, moreover, would qualify under that section of FCA as "original source" of the allegations in this Complaint, even had such a public disclosure occurred.

23.    The Court has subject matter jurisdiction over Defendants' violation of the NY FCA pursuant to 31 U.S.C. § 3732(b) because Defendants' violation of the NY FCA and the FCA all arise out of a common nucleus of operative facts.

24.    This Court has personal jurisdiction and venue over Defendants pursuant to 28 U.S.C. §§ 1391(b) and 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because Defendants have minimum contacts with the United States. Moreover,

Defendants can be found in, reside and transact business in the Eastern District of New York. Specifically, Defendants maintain offices in and Sunrise Defendants employed Relator at adult daycare centers located in Queens County.

25.    Venue is proper in this District pursuant to 31 U.S.C. § 3731(a) because Defendants can be found in and transact business in the Eastern District of New York. At all times relevant to this Complaint, Defendants regularly conducted substantial business within the Eastern District of New York and maintained employees and offices, adult daycare centers, homecare agencies and pharmacies in Queens County, New York.

## THE PARTIES

### Relator

26.    Relator is a resident of Queens County, New York. Relator brings this action for violations of the FCA on behalf of himself and the United States Government and of the NY FCA on behalf of himself and the sovereign government of New York.

27.    Relator was employed with Sunrise as an office administration worker from in or around March 2019 through February 2020 with many responsibilities, including billing to the MLTCs, and thus has direct knowledge of the false claims that the Defendants submitted to the federal and New York State governments.

28.    Relator meets the definition of an original source, as that term is defined under 31 U.S.C. § 3730(e)(4)(B). Specifically, Relator voluntarily disclosed to the government the information that forms the basis of this Complaint prior to any public disclosure under 31 U.S.C. § 3730(e)(4)(A).

### Defendants

### Sunrise Defendants

11

29.     Defendant Sunrise is an active New York Limited Liability Company and, maintains a principal executive office at 105-05 Northern Blvd 1ˢᵗ Floor Corona, NY 11368, with additional operative locations at 3520 147ᵗʰ Street, 2ⁿᵈ Floor, Flushing, NY 11354 and 149-32 41ˢᵗ Avenue, 2ⁿᵈ Floor Flushing, NY 11355.

30.     Sunrise registered with the New York State Department of State on February 20, 2018.

31.     Sunrise has an NPI number of 1396223780, which was assigned in July of 2018. The practioner's primary taxonomy code is 103TA0700X.

32.     Defendant Yang is the current registered owner and president of Sunrise.

33.     Upon information and belief, Defendant Yang's wife, Suji Yang, is the CEO of Sunrise. (*See* **Exhibit B** - KC Advertisement (Korean)).

34.     Yang currently lives at 48 Blackburn Ln., Manahasset, NY 11030.

35.     Defendant Lee is an owner and/or operator of Sunrise.

36.     Lee currently lives at 21508 46ᵗʰ Ave. Bayside, NY 11361.

37.     Lee was registered as a partner with Yang and Jinyoung Kang ("Kang") in 2019, was an initial investor and shareholder of Sunrise and is actively involved in the schemes set forth herein. (*See* **Exhibit C** - Sunrise 2019 Internal Revenue Service Form 1065 at page 10).

38.     Upon information and belief, Lee has worked in the adult daycare field since in or around 2017, with experience at Evergreen Daycare and Flushing Daycare2, prior to becoming an owner and operator of Sunrise.

39.     Lee is responsible for explaining all benefits/kickbacks that Sunrise pays to Members and is responsible for physically handing envelopes with cash kickbacks to Members.

---

2 Upon information and belief, Evergreen Daycare and Flushing Daycare engage in the same fraudulent schemes that are set forth herein with respect to Sunrise.

(*See* **Exhibit D** - Memorandum Regarding New Member Consultation).

40. Kangsan Consulting LLC is an active New York Limited Liability Company owned and operated by Lee with a principal executive office at 4123 150th Street, 2nd Fl., Flushing, NY 11355.

41. KC is actively involved in planning/implementing the scheme set forth herein. Importantly, KC is the primary entity that Members were paid their kickbacks through.

42. Lee owns KC and pays Members their kickbacks/stipends through KC.

43. Oh and Song are Directors of Sunrise and involved in the fraud, but do not own any shares of Sunrise.

**Pharmacy Defendants**

44. My Hope Pharmacy LLC is an active New York Limited Liability Company with a principal executive office at 141-14 Northern Boulevard, Flushing, NY 11354 and an NPI number of 1992125207.

45. My Hope is co-owned by Chen and Victor.

46. Elements Pharmacy Inc. is an active New York Business Corporation with a principal executive office at 3808 Union St., Ste. D2, Flushing, NY 11354 and an NPI number of 1750846226.

47. Elements is owned by Chen.

48. Royal Care Drugs Inc. is an active New York Business Corporation with a principal executive office at 136-71 41st Ave., Flushing, NY 11355 and an NPI number of 1750895462.

49. Royal is owned by Victor.

50. Doremi, Inc. is an active New York Business Corporation with a principal

executive office at 136-58 39th Ave., Flushing, NY 11354 and an NPI number of 1306362132.

51.    The Pharmacies have been actively involved in the fraud described herein by telling Sunrise which prescriptions will yield a higher compensation by Medicaid and/or Medicare (knowing that Sunrise will then have its Members obtain these prescriptions for kickbacks), accepting prescriptions which the Pharmacies knows are not necessary, accepting OTC cards for improper use, paying kickbacks to Sunrise when the specified prescriptions are paid for by Medicaid and/or Medicaid which they know Sunrise gives to Members and giving H-Mart coupons or the cash value of such coupons less ten percent (10%) to Members who fill certain prescriptions.

52.    Victor is an owner and/or operator of Royal and My Hope.

53.    Victor invested in opening the second Sunrise daycare location and receives kickbacks for approximately one-hundred (100) Members from Sunrise.

54.    Chen is an owner and/or operator of Elements and My Hope.

**Shen Han Lin, D.O.**

55.    Shen Han Lin, D.O. is Primary Care Doctor specializing in Family Medicine who operates out of a medical office at 133-42 39th Ave., Ste. 253, Flushing, NY 11354 and an NPI number of 1225230154.

56.    Dr. Lin accepted referrals from Sunrise and made false diagnoses for several prospective or current Members so that they would be eligible daycare services and/or medications that they did not require.

57.    Upon information and belief, Dr. Lin no longer regularly accepts referrals from Sunrise.

**Homecare Agencies**

58. SR Homecare of NY, Inc. is an active New York Business Corporation with a principal executive office at 37-10 149th Place, Ste. 1B, Flushing, NY 11354. According to the New York State Department of State Division of Corporations website, the Chief Executive Office is Mi J. Kim. SR's NPI number is 1316378318.

59. Human Care, LLC is an active New York Business Limited Liability Company with a principal executive office at 1768 39th Street, Brooklyn, NY 11232 and an NPI number of 1730438706.

60. Elim Home Care Agency, LLC is an active New York Business Limited Liability Company with a principal executive office at 4131 163rd St. Fl. 1, Flushing, NY 11358 and an NPI number of 1548787716.

61. Help Home Health Care Agency LLC is an active New York Business Limited Liability Company with a principal executive office at 39-07 Prince St., Queens, NY 11354 and an NPI number of 1831626241.

62. X-Treme Care, LLC is an active New York Business Limited Liability Company with a principal executive office at 212-12 Northern Boulevard, #2A, Bayside, NY 11361 and an NPI number of 1174793996.

63. The Homecare Agencies employ home health aides who regularly bill Medicare, Medicaid and MLTCs for services that they do not provide to Members, which is required for Members and helped them keep up the rouse that they are in-fact chronically ill or disabled enough to be eligible for adult daycare services and continue to receive kickbacks from Sunrise Defendants.

64. The vast majority, if not all, of Sunrise' Members are Medicare and/or Medicaid patients, many of who became eligible for Medicare and/or Medicaid based on false information.

## APPLICABLE LAW

### I.    FEDERAL FALSE CLAIMS ACT

65. The FCA provides, in pertinent part:

(a)    Any person who: (1) knowingly presents, or causes to be presented, to an officer or employee of the United States government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false claim allowed or paid, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $11,000, plus three (3) times the amount of damages which the Government sustains as a result of the act of that person.

(b)    For purposes of this section, the term "knowing" and "knowingly" mean that a person, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent is required.

66.    Billing the Government for services not provided or for harmful, worthless, inappropriate, or unacceptable services violates the FCA.

67.    Billing the Government while not disclosing information that had the Government known it would not have paid the claim violates the FCA.

68.    Misappropriating Government money for purposes other than those intended by the Government also violates the FCA.

### II. NEW YORK FALSE CLAIMS ACT

69. The NY FCA became effective in April of 2007 and is modeled after the FCA.

70. The NY FCA provides, in pertinent part:

(a)    Any person who: (1) knowingly presents, or causes to be presented, to any employee, officer or agent of the state or local government, a false or fraudulent claim for payment or approval;

16

(2) knowingly makes, uses, or causes to made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a local government; (3) conspires to defraud the state or a local government by getting a false claim allowed or paid, shall be liable to the state and local government for a civil penalty of not less than six thousand dollars and not more than twelve thousand dollars, plus three (3) times the amount of damages which the state and/or local government sustains.

(b)    For purposes of this section, the term "knowing" and "knowingly" mean that a person, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent is required.

71.    The acts described herein which violate the FCA similarly violate the NY FCA.

## III.    BACKGROUND ON FEDERAL AND STATE FUNDED HEALTH INSURANCE PROGRAMS

### A.    Medicare

72.    In 1965, Congress enacted Title XVIII of the Social Security Act ("Medicare"), to pay for the cost of certain medical services, for persons 65 and older, and for persons with disabilities. *See* 42 U.S.C. § 1395k(a)(2)(C).

73.    Critical to the continued solvency and viability of the Medicare program is that healthcare providers bill only for services that are actually performed.

74.    The Department of Health and Human Services ("HHS") is responsible for the funding administration and supervision of the Medicare program. The Center for Medicare Services ("CMS") is the division of HHS that is directly responsible for the administration of Medicare. Medicare Part A provides hospital insurance benefits to the elderly and disabled. *See* 42 U.S.C. § 1395c *et seq.* Medicare Part B is a federally subsidized, voluntary insurance program that pays a portion of the cost of certain medical and other health services not covered by the Part A program. Reimbursement for Medicare claims is made by the United States through CMS.

75.    To participate in the Medicare program, a healthcare provider must enter into a contract with CMS in which the provider agrees to conform to all applicable statutory and regulatory provisions relating to Medicare payments and reimbursements. *See* 42 U.S.C. § 1395cc. For example, healthcare providers participating in the Medicare program must:

(a) Refrain from making false statements or misrepresentations of material facts concerning payment requests;

(b) Not bill for any services or products that were not performed or delivered in accordance with all applicable policies;

(c) Be fully licensed and/or certified under all applicable state and federal laws to perform the services provided to the recipients;

(d) Comply with the applicable state and federal statutes, policies and regulations;

(e) Not engage in any illegal activities related to the furnishing of services or products to recipients;

(f) Must accept the "allowable charge" as determined by Medicare as full payment for covered services.

*See* 42 U.S.C. § 1395, *et seq.*

76.    At all times relevant to the Complaint, Defendants were participating Medicare providers. Thus, at all times material to this Complaint, Defendants were required to obey all federal and state laws and regulations governing Medicare providers, including the FCA and NY FCA which prohibit: (1) False statements and certifications when applying for any benefit or payment under Medicare laws; and (2) Presenting or causing to be presented any false or fraudulent claims under Medicare. *See* 42 U.S.C. § 422.504(h)(1).

### B.    Medicaid

77.    Medicaid was created in 1965, at the same time as Medicare, when Title XIX was added to the Social Security Act. The Medicaid program aides the states in furnishing medical assistance to eligible needy persons, including indigent and disabled people. Medicaid is the

18

largest source of funding for medical and health-related services for America's poorest people.

78.    Medicaid is a cooperative federal-state public assistance program which is administered by the states.

79.    Funding for Medicaid is shared between the federal government and those state governments that choose to participate in the program.

80.    Title XIX of the Social Security Act allows considerable flexibility within the States' Medicaid plans and therefore, specific Medicaid coverage and eligibility guidelines vary from state to state.

81.    However, in order to receive federal matching funds, a state Medicaid program must meet certain minimum coverage and eligibility standards. A state must provide Medicaid coverage to needy individuals and families in five broad groups: pregnant women; children and teenagers; seniors; people with disabilities; and people who are blind. In addition, the state Medicaid program must provide medical assistance for certain basic services, including inpatient and outpatient hospital services.

82.    The New York Medicaid program is administered by the New York State Department of Health ("DOH"). Determinations of enrollee eligibility are made by the fifty-eight (58) county New York Departments of Social Services ("DSS") and the New York City Human Resources Administration ("HRA").

83.    The Federal Medicaid Assistance Percentage ("FMAP") for the State of New York is currently fifty percent (50%). This means that the federal government provides fifty percent (50%) of the funding for New York Medicaid, and the remaining fifty percent (50%) of the fund is paid by the State of New York.

C.    **Medicare and Medicaid Reimbursement**

19

84.    HHS, acting pursuant to the Medicare statute, has promulgated regulations governing reimbursement for medical services provided to Medicare beneficiaries.

85.    In order to be reimbursed by Medicare and Medicaid for services provided to its beneficiaries, medical service providers must certify that they have complied with applicable requirements in the regulations.

86.    Medicare pays only for services that are reasonable, *medically necessary* and utilized for diagnostic and therapeutic purposes in connection with health care services provided to Medicare beneficiaries. 42 U.S.C. § 1395y(a)(1).

87.    Accordingly, the form that physicians or suppliers must submit to Medicare and Medicaid in order to be entitled to reimbursement includes the following certification: "Signature of Physician or Supplier: I certify that the services shown on  this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision." CMS Form 1500.

88.    Healthcare providers are reimbursed under Medicare and Medicaid only if the healthcare provider assures that: (1) No claim for an item or service is based upon a code that will provide greater payment than the code which is applicable to the item or service actually provided; and (2) Claims submitted for reimbursement do not make false statements or misrepresentations of material facts.

89.    A healthcare provider must also certify that it is in compliance with applicable federal and state statutes, rules and regulations. Indeed, CMS conditions payment upon the services being personally provided by, or in some instances, supervised by, the licensed professional who has applied for and received a provider identification number. Medicare and

Medicaid regulations expressly provide that all claims for services of providers or suppliers must be signed by the provider or supplier, which in turn certifies that the invoices are in compliance with Medicare laws. 42 C.F.R. § 424.33(b). A knowing failure to comply with such authority renders a claim false where the provider has certified compliance with the applicable authority, even if the provider rendered the service for which it seeks reimbursement.

90.    Despite Defendants' knowledge of these statutory requirements, Defendants routinely and knowingly submitted claims to Medicare and Medicaid for payment that violated one or more of these statutory requirements. For example, Defendants submitted claims:

- For medically unnecessary prescriptions, home health aide, physician visits and daycare services; and

- For daycare services and transportation which were not provided.

**D.    Certification**

91.    Each and every bill submitted by healthcare providers for Medicare or Medicaid reimbursement is certified by signature of the treating physician or provider.

92.    For ease of use, CMS publishes uniform health insurance claim form 1500.

93.    CMS form 1500, signed by the physician or provider, whether filed electronically or by hard copy via U.S. Mail, contains a certification that the services for which the request for reimbursement being submitted, were "medically indicated and necessary for the health of the patient and were personally furnished by me or my employee under my personal [direction or supervision]."

**IV.    Managed Long Term Care Plans**

94.    MLTC "is a system that streamlines the delivery of long-term services to people who are chronically ill or disabled and who wish to stay in their homes and communities. These

services, such as home care or adult daycare, are provided through managed long-term care plans that are approved by the [DOH]." (health.ny.gov/health_care/managed_care/mltc)

95.    Enrollment in a MLTC plan is mandatory for those who are dual eligible for both Medicaid and Medicare and over 21 years of age and need community based long-term care services for more than 120 days; and reside in the counties of NYC, Nassau, Suffolk or Westchester. *Id.*

96.    There are three (3) types of MLTC plans: Medicaid long term care services (where an individual can still see his or her current doctors through Medicare); Medicaid Advantage Plus Plan (manages both Medicaid and Medicare services, where all care is from one Plan); and Program for All-Inclusive Care for the Eldery ("PACE") for those who at least are fifty-five (55) years old and prefer an all-inclusive plan.

97.    All MLTC plans include adult day health care services.

98.    Sunrise is an adult day health care provider under Integra, AgeWell and, more recently, Village Care.

99.    The billing address for Integra is 1981 Marcus Ave., Suite 100, Lake Success, NY 11042.

100.    The billing address for AgeWell is AgeWell New York, P.O. Box. 21536, Eagan, MN 55121.

101.    Upon information and belief, the billing address for Village Care is 112 Charles Street New York, NY 10014.

102.    The primary MLTCs working with Sunrise throughout Relator's employment period were Integra and AgeWell.

103.    Upon information and belief, however, recently Sunrise is encouraging and

22

helping its members to switch to Village Care.

## V.    ADULT DAY CARE

104.    A social adult day care ("SADC") is a structured program that provides functionally impaired older adults with socialization, supervision and monitoring; personal care, and nutrition in a protective setting.

105.    All SADCs are required to register with DFTA prior to operating in New York City and must keep their information up to date.

106.    SADCs must comply with New York State Office for the Aging Standards and Local Law 9 of 2015, codified at Section 21-204 of the Administrative Code.

107.    Pursuant to NYC Local Law 9 of 2015, § 21-204(2)(b)(1): "A…limited liability copany…shall not operate as a social adult day care without having registered with the [DFTA]."

108.    Moreover, SADCs must adhere to DFTA program standards as set forth at https://aging.ny.gov/social-adult-day-services-sads.

109.    SADCs are regulated by the Director of the New York State Office for the Aging regarding SADC programs, pursuant to Section 215 of the elder law, and promulgated at 9 NYCRR § 66654.20, or such successor regulations.

110.    Such regulations provide:

   a.  A SADC program is a "structured, comprehensive program which provides functionally impaired individuals with socialization, supervision and monitoring; personal care; and nutrition in a protective setting during any part of the day, but for less than a 24-hour period. Additional services may include and are not limited to maintenance and enhancement of daily living skills, transportation, caregiving assistance, and case coordination and assistance." 9 NYCRR § 66654.20.

b. "Functionally impaired means needing the assistance of another person in at least one of the following activities of daily living: toileting, mobility, transferring, or eating; or needing supervision due to cognitive and/or psycho-social impairment." *Id.*

c. A SADC "shall serve only individuals who are functionally impaired and will benefit from participation in the program...whose needs can be met and managed by the program...only after an assessment of the individual's functional capacities and impairments." *Id.*

d. "Each participant [Member] shall receive services only in accordance with an individualized written service plan which has been developed by the program staff in conjunction with the participant..." *Id.*

e. All programs are required to provide the following services: socialization (planned and structured activities) including social, intellectual, cultural, educational, and physical group activities; supervision and monitoring; personal care; and nutrition. *Id.*

f. Optional services include: maintenance enhancement of daily living skills; transportation between home and the program; caregiver assistance; case coordination and assistance. *Id.*

g. All SADC programs are required to have "an adequate number of qualified staff...to perform all of the functions prescribed....and to ensure the health, safety, and welfare of [Members]." *Id.*

**STATEMENT OF FACTS**

I.  **SUNRISE DEFENDANTS' BUSINESS**

111.    Sunrise is registered as an adult day health care and is popular in the Korean elderly community in Queens, New York. It is renown within the community for giving large cash kickbacks to Members for simply signing up for daycare services and participating in Sunrise's illegal schemes, but not actually utilizing any daycare services.

112.    Sunrise registered with the New York State Department of State Division of Corporations in February of 2018 and began operating as a SADC in the beginning of 2019.

113.    In 2019, the owners of Sunrise were Lee, Yang and Kang.

114.    Since in or around 2020 and currently, the only shareholder is Yang, however, Lee continues to operate Sunrise and is particularly involved in the recruitment of new Members and payment of referral fees and kickbacks through his company, KC.

115.    Sunrise's central office is located at 105-05 Northern Boulevard, 1st Floor, Queens, NY 11368. It operates additional locations at 149-32 41st Avenue, 2nd Floor, Flushing, NY 11355 (although this location is unregistered with the DFTA) and 3520 147th Street, 2nd Floor, Flushing, NY 11354.

116.    Members who actually attend daycare (approximately one-third (1/3) of the roster) typically attend the location at 3520 147th Street because it is the most convenient for them.

117.    Sunrise advertises that it provides "precisely customized social services," and that "experts with licenses give assistance regarding day care, home care, Medicaid, Medicaid, food stamp, rent subsidiary, application for pension (SSA), grant for seniors (SSI), disability pension, senior housing, tax matters, tax reporting, tax returns, etc." (*See* Exhibit B - KC Advertisement).

118.    Sunrise advertises that it is open from eight o'clock in the morning through five o'clock in the evening (8:00 am – 5:00 pm), that the "first location" (Corona, i.e., 105-05

25

Northern Boulevard) provides sports including table tennis and billiards and the "second location (Flushing Restaurant Alley, i.e., 149-32 41st Avenue) has a variety of programs regarding computer, singing class, dance, cellphone, etc. (*Id*.)

II.    **DEFEDANTS' FRAUDULENT SCHEMES**

A. **Fraudulent Daycare Recruitment Process**

119.    Potential Sunrise Members, who are typically recruited by current Members or Sunrise employees, must first apply for Medicare/Medicaid and a MLTC plan.

120.    Current Members receive kickbacks for recruiting new members, either on a monthly or per-Member basis. (*See* **Exhibit E** (text message from Vincent Park to Lee regarding recruiting new members)).

121.    Prior to submitting their applications, potential Members will meet with Lee who will explain the kickback scheme and amount, as well as their participation requirements in the scheme.

122.    Lee explains that kickbacks will be provided in cash through KC, and therefore are not traceable back to the daycare. Lee tells Members that the kickbacks are lawful.

123.    Once they apply, the potential Member receives two (2) visits from a registered nurse ("RN"). The first RN is assigned by the government to determine eligibility and the second is assigned by the MLTC to determine a care plan, including how many hours of daycare and home health aide services the potential Member will require.

124.    The potential Member is instructed to lie about their health (e.g., pretend to have difficulties walking, moving or going to the bathroom, etc.), often preceded by a visit to Dr. Lin in order to obtain certain prescriptions that are not required, but will make them look "functionally impaired" to the RNs performing the initial visits.

125.    Furthermore, sometimes Sunrise or KC employees pretended to be a Members' family member in order to help Members lie to the RNs.

126.    Employees of KC are instructed to follow a particular prompt when speaking to new Members. Members are told that they must "answer (lie) to insurance companies [daycare] centers and [home care] centers that [they] receive [home health aide] services during the designed hours, and meal and tele (sic.) services from [daycare[] for 3 days....[in order to receive] gifts as promised." (*See* Exhibit D - Memorandum Regarding New Member Consultation).

### B. Billing for Daycare Services Not Provided and/or Inappropriate, Unnecessary, Substandard, Unacceptable and Worthless Services and Kickbacks Provided to Members for Participation

127.    Defendants billed for services that were not provided, substandard, inappropriate, unacceptable, harmful, worthless and/or unnecessary, and violated the DOH, Medicare and Medicaid regulations.

128.    Most egregiously, while Sunrise would enroll approximately five hundred (500) Members in their adult daycare program, they simply would not provide any service for approximately two-thirds (2/3) of these members.

129.    Rather, potential Members were recruited with the promise of monthly kickbacks for participation in the scheme. Sunrise Defendants, specifically Lee, would explain to potential Members that they must provide certain false information to the Government in order to become eligible to receive adult daycare services by Sunrise.

130.    In order to become eligible, Sunrise Defendants would refer potential Members to Dr. Lin or another doctor that they were working with in the scheme in order to obtain false diagnoses for the Members and false prescriptions which were filled at one of the Pharmacies,

27

would refer potential Members to Homecare Agencies and home health aides to sign up for services, and would help potential members obtain health insurance and/or Medicare and/or Medicaid which would pay for daycare and related services.

131.    Once potential members became eligible to attend daycare, Sunrise Defendants would instruct Members to come in once per month to sign attendance sheets certifying that they attended daycare a certain number of days per week in exchange for their monthly stipend. Sunrise Defendants would then submit the attendance sheets to Medicare and/or Medicaid through the appropriate MLTC in order to receive payment for each date that the Members falsely certified they attended daycare.

132.    When an MLTC would audit Sunrise, which typically happened once per year per MLTC, and Sunrise did have fully executed sign-in/sign-out sheets from Members, Sunrise would have one of its employees (either by or upon direction by Oh), forge Members' signatures.

133.    There were in or around three (3) audits during Relator's employment with Sunrise: one (1) by AgeWell in September 2019, and one (1) by Integra in October or November 2019.

134.    The audits were not thorough, the MLTC would simply check the sign-in/sign-out sheet and the activity programming.

135.    Prior to an upcoming audit, Sunrise would typically call Members and ask them to visit Sunrise on the date of the audit. When the audit was performed, Sunrise would lie and tell the auditors that it had more employees, but they were running errands, and that the Members were shopping or having a picnic.

136.    Upon information and belief, no MLTC audits were conducted from in or around March of 2020 (the beginning of the Coronavirus/Covid-19 pandemic) through in or around May

28

of 2021, when Sunrise was largely closed to in-person daycare, but additional audits began in or around June or July of 2021.

137.    Sunrise would also submit that they provided transportation services to Members when they often did not. Rather, Sunrise Defendants would do everything in their power to avoid actually providing such transportation services, including encouraging and even assisting Members to arrive via ambulette such that the Government would pay twice for Members' transportation (via ambulette and Daycare), even when only one or none was provided.

138.    Members were not always eligible to use ambulette services and would lie (or Sunrise employees would lie) when they scheduled the ambulette to take them to Sunrise.

139.    While approximately one-third (1/3) of the Members would physically attend daycare on a regular basis, no real social services were provided as is required. Rather, any Members who would attend daycare would simply come in to socialize, do an activity or take a "class," and/or receive a free meal.

140.    If a Member attended daycare prior to MLTC insurance authorization, Sunrise would claim that the service was provided after the date of authorization in order to receive payment from the Government. (*See* **Exhibit F** - Intake Update – Current Status (2021-08-19) Tab, Column D).

141.    In fact, it was impossible for Sunrise to provide any actual daycare services in that they only employed between ten (10) and fifteen (15) employees, five (5) to seven (7) of whom were drivers. The remaining five (5) to eight (8) employees were office administration employees, such as the Relator. Moreover, Sunrise employed no licensed social workers.

142.    Even the seven (7) drivers were wholly inadequate to provide the amount of driving services that Sunrise Defendants billed the government for.

29

143.    Sunrise received payment of eighty-five dollars ($85) per day per Member from the Government for providing daycare services ($45) and transportation ($40) each day that the Member signed that he or she received services throughout the month.

144.    In the beginning of the Covid-19 pandemic (beginning in or around March 2020 through in or around June of 2021), Sunrise was not providing any in-person daycare services.

145.    While Sunrise was closed, they continued with the scheme by alleging to the Government that they were providing remote services (i.e., tele-monitoring and meal services) when they were not, and billing as such for forty-five dollars ($45) per day per Member as they could not even allege that transportation services were provided.

146.    Sunrise Defendants, and specifically Lee through KC, would provide monthly kickbacks of typically three hundred to four hundred dollars ($300.00-$400.00) per month per Member for participating in the daycare portion of the scheme plus additional kickbacks for the pharmacy, homecare, etc. schemes amounting to approximately seven hundred dollars to ($700.00) to over one thousand two hundred dollars ($1,200.00) per month. Kickbacks were typically provided in cash from KC.

147.    Monthly kickbacks to Members were include, but are not limited to, the following:

    a.    A part of the MLTC (Integra/AgeWell) insurance paid for daycare services;

    b.    A part of the money that the Homecare Agencies would give to Sunrise/Lee;

    c.    Half of the price of the main medicine (e.g., Diclofenac patch) that the Members received by a fraudulent prescription (typically amounting to $150 per medicine (which typically was priced at $300));

    d.    A part of the money from other medicines (e.g., Nasone, Lovaza) that the

Members received by a fraudulent prescription (typically amounting to $30 per additional medicine);

e.  One hundred ($100) dollars from an "OTC Card" by Empire or United which the Pharmacies would swipe for an improper use to receive payment from the government, then pay KC who paid cash to Members;

f.  Food benefit, typically thirty dollars ($30) for members with a United insurance plan;

g.  H-Mart food coupon, accumulating at the rate of three dollars ($3) per one (1) medicine. Members would receive food coupons when the total value of the coupons amounted to twenty dollars ($20) or more. When H-Mart coupons were not available or when Members preferred cash over a coupon, Sunrise Defendants would give Members the cash value of the coupon, less ten percent (10%) (i.e., 90% of the coupon value).

148.  Evidence of the kickback scheme is included in Exhibits G through K which show:

a.  Member names and amount of gifts each month (**Exhibit G**);

b.  Memorandum outlining what Sunrise employees should say to new Members regarding their benefits (**Exhibit H**);

c.  List to check, Consultation Journal (2020.11-2021.01) (**Exhibit I**);

d.  Messages from Members to Sunrise (regarding their kickbacks) (**Exhibit J**);

e.  Sunrise combined weekly expense (**Exhibit K**);

149.  Kickbacks were provided to Members for daycare at the following rates:

a.  One (1) day of daycare/week: $60/month;

31

b. Two (2) days of daycare/week: $130/month;

c. Three (3) days of daycare/week: $200/month if member actually attends three days/week;

d. Three (3) days of daycare/week: $300 to $400/month when the member does not attend daycare at all;

e. Four (4) days of daycare/week: $400/month when the member attends only one or two days per week; and

f. Five (5) days of daycare/week: $500/month when the member does not attend daycare at all. (*See* Exhibit H).

150. Sunrise Defendants would pay certain Members, or even non-Member individuals, as though they were employees each month who would make referrals for new Members who would sign up with Sunrise.

151. Sunrise operated a location which was not properly registered, located at 149-32 41st Avenue, 2nd Floor Flushing, NY 11355. While Sunrise was warned by the DFTA not to operate at this location, Sunrise lied through Yang to the DFTA and said that such location is no longer in operation. Upon information and belief, however, the location is still operative.

152. Sunrise failed to provide its Members with any services, including but not limited to adequate supervision, adequate nursing, adequate and/or appropriate care, allowed Members to either not come in at all for services or come in simply to socialize, failed to provide health-related services, including failing to provide physical or occupational therapy – in fact, there were no "experts" or licensed social workers to provide therapy at Sunrise, and failed to provide transportation.

153. Sunrise thus billed Medicare and Medicaid for the daily rate of registrants despite

failing to provide appropriate, acceptable, reasonable and necessary, or otherwise reimbursable services, and in fact failing to provide health related services at all. This violated the False Claims Act on its face as well as DOH rules and regulations, with which Defendants expressly and impliedly certified compliance.

154.    Therefore, Defendants violated the FCA for multiple reasons. First, by billing for lack of services or worthless and unnessary services amounted to per se violations of the FCA. Second, billing for any purported services provided by unqualified individuals also violates the FCA.

## C. Dr. Lin and Other Participating Physicians

155.    Sunrise Defendants partnered with Dr. Lin and other physicians, the Pharmacies and the Homecare Agencies in order to further their scheme to defraud the Government.

156.    Sunrise Defendants would refer potential Members to Dr. Lin or other physicians to obtain false diagnoses and false prescriptions necessary for them to qualify for Medicare/Medicaid and Adult Daycare Services. *See* Exhibits L through O:

    a.   Sunrise to Dr. Lin (Asking for fake prescription) - 2021.05.12 (**Exhibit L**);

    b.   List to check, Consultation Journal (2020.11-2021.01)] (Exhibit I),

    c.   Intake update (2020.10-2021.09) (stating Dr. Lin was "supposed to give three (3) medicines, only gave one (1)") (**Exhibit M**);

    d.   Pharmacy gifts (2020.06-2021.08) (**Exhibit N**);

    e.   Move to Dr. Lin (2021.01.29) (**Exhibit O**).

157.    Dr. Lin and other physicians would oblige by providing medically unnecessary services and making incorrect diagnoses which would allow them to write false prescriptions.

## D. Pharmacies' Involvment

158. Members would fill the prescriptions at the Pharmacies in order to receive the prescriptions, which were often medically unnecessary.

159. Pharmacies, often through Victor, would tell Sunrise Defendants which prescription medications the Government was currently reimbursing the Pharmacies at a higher rate (who would then tell Dr. Lin or other physicians) in order to request Members obtain prescriptions for such medications.

160. Pharmacies would pay kickbacks to Sunrise Defendants, who would then pay additional kickbacks to the Members through KC. (*See, e.g..*, Ex. M - Intake update (2020.10-2021-09 – Memo re consultation ("called phar. And asked for money re: coupons, etc.")))

161. The higher the value of the prescriptions to the pharmacy, the higher the kickbacks paid to Sunrise Defendants.

162. Members would also receive certain pharmacy cards, known as "OTC Cards" from insurance companies for either one hundred dollars ($100.00) for Empire or one hundred and thirty dollars ($130) for United per month per Member which were intended for use for medication which they would bring to Pharmacies who were instructed to swipe them for a random over-the-counter medication to receive cash from the government. Pharmacies would then give the cash to Sunrise Defendants who would give one hundred dollars ($100.00) of the cash to Members.

163. KC would send the Pharmacies a list of Members whose OTC Cards should be swiped. (*See* **Exhibit P** - Screenshot of email (Lee to My Hope) 2021.05.20).

164. Moreover, Pharmacies would provide coupons to H-Mart for Members, or the cash value less ten percent (10%) of the coupon. (*See* **Exhibits Q** (Phar. gifts (2020.06-2021.08)) and **R** (Email from KC to Doremi (2021.08.19)).

165.    In order to distance themselves from the fraud, Pharmacies would provide H-Mart coupons and/or cash to KC for KC to provide to Members.

166.    Members were not permitted to speak about kickbacks at the Pharmacies or Sunrise in general.

167.    Lee, Song, or Hyunsoo Cho (Sunrise and KC employee) would go to Pharmacies to receive cash in person on a regular basis.

### E.    Homecare Agencies Billed for Services Which Were Not Provided

168.    Finally, in order to obtain daycare services, Members were also required to obtain home health aide services. As such, Sunrise Defendants would refer Members to one of the Homecare Agencies in order to sign up with a home health aide.

169.    Similar to the daycare scheme, however, while no services were provided, the Aide/Sunrise employee and Member would sign certain treatment logs as though services were provided and submit such fraudulent logs to the Government for payment. (*See* Exhibit M (Tab entitled "Intake update (2020.10-2021.09)")).

170.    Many of the Aides were actually members of Sunrise or KC such as Soyoung Kang (also known as Suji Yang), Kyunghui Kim and Wonjung Seo. (*See* **Exhibit S** - Excel spreadsheet entitled "HC (2020.11-2021.01)" (Tab entitled Money given to Caregiver)).

171.    Others were family members or acquaintances of the Members.

172.    Members and Aides were trained to lie to MLTCs and RNs and say that they received/provided home health care services during designated hours. Specifically, Sunrise/KC trained Members to say that the Aide was away when the MLTC or RN asked to speak to him/her (and vice versa). (*See* Exhibit S – Excel spreadsheet entitled "HC (2020.11-2021.01)" (specifically see "whether to train" to confirm whether the Member and Aide received such

specific training).

173.    After the Homecare Agency or Aide received money from the government, they were required to send Lee money, deducting its, his or her own share. (*See* Exhibit S - Excel spreadsheet entitled "HC (2020.11-2021.01)" (Tab entitled Money given to Caregiver)).

### E.    Transportation

174.    While Sunrise typically billed Medicare/Medicaid through the MLTC for the cost of transportation to/from daycare for Members through a Sunrise vehicle and driver, Sunrise rarely provided rides to/from daycare because: (1) Members did not typically attend daycare; and (2) when Members did come in to sign their monthly attendance sheets and receive kickbacks they were instructed to take an ambulette, which Sunrise referred to as an "MLTC Ambulance" or "MD Vehicle." (*See* **Exhibit T** - Guidance re: MLTC ambulance).

175.    Members were instructed to lie to insurance companies to tell them that they took a Sunrise vehicle rather, even if they took an ambulette. (*Id.*)

176.    In exchange for coming to Sunrise by an ambulette, Members would receive coupons which could be exchanged for items at Sunrise. A total of twenty (20) such coupons could be exchanged for "gifts" at KC. (*Id.*)

177.    Sunrise employees would often call the ambulette to arrange transportation for Members.

178.    Members were not typically qualified for ambulette services, which requires certain health impairments, but they would lie (or the Sunrise employee arranging transportation by ambulette would lie) in order to receive such services.

179.    This resulted in Defendants billing the government for rides which were not taken or double billing for rides which were taken through the ambulette.

F. **Defendants' Conduct was Material**

180.   Defendants' conduct had a natural tendency to influence or was capable of influencing the Federal Government and the State of New York to pay Defendants' Medicare and/or Medicaid claims for multiple reasons.

181.   To the extent the Defendants failed to provide health-related services or provided worthless or unnecessary services, this would clearly influence the Government's decision to pay for those claims, since the Government simply does not reimburse for such claims.

182.   As to Defendants' billing for services which were not medically necessary or not provided at all, Medicare and/or Medicaid will not reimburse for such services as a matter of law, demonstrating a natural tendency of such conduct to influence the decision by the government whether to pay such claims.

G. **Evidence of the False Claims**

183.   Relator is in possession of a significant amount of evidence which supports the schemes described herein, much has been referenced throughout and appended hereto and the remainder which is attached to Relator's written disclosures. The evidence includes:

a. A prompt for calling new members and providing benefits/kickbacks information. (Ex. H).

b. A prompt instructing Members how to respond to respond (lie) to insurance companies in order to receive "gifts." (**Exhibit U** ("Calling New & Existing Members").

c. A spreadsheet setting forth Member attendance. (**Exhibits V** (DC member attendance (2021.08.06)) & **W** (DC member attendance (2021.09.17)).

d. An email to Dr. Lin requesting a fake prescription. (Exhibit L).

37

e. A spreadsheet listing names of Members and details of their membership. (**Exhibit X** (DC total members (2021.08-2021.09)).

f. An email from KC to Doremi setting forth the referral stipend and monthly kickback scheme. (**Exhibit Y**- Email from KC to Doremi).

g. A memorandum instructing Members to lie and tell insurance companies that they take Sunrise ("DC") vehicles  even if they take an MLTC ambulance to Sunrise. (Exhibit T - Guidance re MLTC ambulance).

h. Memorandum included in a spreadsheet stating that daycare services will be postdated if they occur prior to MLTC authorization. (Exhibit M - Intake update (2020.10-2021.09)).

i. Spreadsheets with specific amounts and information regarding gifts/kickbacks to members. (Exhibits I - List to check, Consultation Journal 2020.11-2021.01; K - Sunrise combined weekly expense book (see columns N & O); and **Z** - Total gifts (2020.07-2021.09)).

j. Text message from a Member asking Sunrise for more money/kickbacks. (**Exhibit AA** - Memo to DC).

k. Text message from a Member to Lee regarding another daycare center providing larger kickbacks than Sunrise. (Exhibit E - Member to Lee).

l. Letter from DFTA to Sunrise regarding a complaint about kickbacks to members and utilizing an unregistered location and Yang's response. (Exhibit A).

m. Spreadsheet regarding gifts from Pharmacies. (Exhibit N - Pharmacy Gifts).

n. Letter regarding "Morin"'s referral payments. (**Exhibit BB** - Referral Morin).

o. Spreadsheet containing contact information for Sunrise employees, Pharmacies,

Home Care Agencies, etc. (**Exhibit CC** - Spreadsheet of Contact Info.)

p. Certain documents regarding billing to MLTCs. (**Exhibits DD** - Agewell claims (paid); **EE** - Book for Integra claims; **FF** and **GG** - Integra claims (paid); **HH** - Visit Report for Integra claims).

q. Sunrise Payroll Register August 13, 2021 with only one employee (Grace Lee) on the payroll. (**Exhibit II**).

## III.    RELATOR'S EMPLOYMENT WITH DEFENDANTS

184.    Qui Tam Relator/Plaintiff Kang worked for Sunrise from in or around March 2019 through in or around February 2020 (the "Kang Employment Period").

185.    Throughout the Kang Employment Period, Kang performed work related to billing directly to MLTCs Integra and AgeWell, petty cash, organizing receipts, social services, member services, secretary tasks, etc.

186.    While Kang's work schedule changed every month, or every other month, Kang typically worked two to three (2-3) days per week at the Sunrise location at 105-05 Northern Blvd in Corona in the morning and then in the afternoon at 41-23 Murray St. #201 Flushing, NY 11355.

187.    Kang typically worked between sixteen (16) and twenty-four (24) hours per week.

188.    Throughout the Kang Employment Period, Members would typically visit the Murray Location to sign attendance sheets.

189.    Kang was paid two hundred to four hundred dollars ($200-$400) per week by check.

## IV.    DAMAGE ESTIMATES

190.    Relator estimates that Sunrise Defendants would bill MLTCs for daycare and

transportation provided for approximately two-thirds (2/3) of the Members currently on the roster who would not attend daycare at all.

191.    Even the one-third of the Members who would attend Sunrise, however, would not be provided with the services required under the NYCRR.

192.    Assuming an average roster of three hundred (300) Members for the past three (3) years at Sunrise, payment of eighty-five dollars ($85) per day for the dates where in-person services were permitted (i.e., January 2019 through February 2020 and July 2021 to present) and forty-five dollars ($45) per day for the dates when in-person services were suspended due to the Coronavirus/Covid-19 pandemic (i.e., March 2020 through June 2021) and an average of three (3) days/week of daycare/transportation services billed for, Sunrise Defendants have fraudulently received approximately nine million seven hundred, sixty-nine thousand and four hundred ninety eight dollars ($9,769,498.00) from the government.

193.    This number does not include the amount that the Pharmacies and Homecare Agencies received.

194.    Nearly all of Defendants' business is through Medicare or Medicaid, and nearly all of Defendants' income is derived from Medicare or Medicaid.

195.    Upon information and belief, for at least the past three (3) years, Defendants have engaged in the above-described schemes.

196.    Upon information and belief, each Defendant was purposely engaging in the above-described schemes in order to improperly bill Medicare or Medicaid through MLTCs.

197.    Each document which was fraudulently presented to the United States would be a false claim subject to an additional $5,500 to $11,000 per false claim in penalties (assuming a minimum of 122,400 false claims over the last three (3) years times the average penalty of

40

$8,250.00, over $1 billion), in claims to the New York State or local governments would be a false claim subject to an additional $6,000 to $12,000 per false claim in penalties (assuming a minimum of 122,400 false claims over the last three (3) years times the average penalty of $9,000, over $1.1 billion).

198.    This amounts to over **$2.1 billion in damages** under the Federal and New York State False Claims Acts **in penalties alone**.

199.    As for actual damages, assuming approximately three (3) false claims per week for an average of three-hundred (300) Members, for three (3) years, with $85 per false claim for twenty-one (21) months/ninety (90) weeks, or nearly $7 million and $45 per false claim for sixteen (16) months/sixty-nine (69) weeks or over $2.8 million, for a total of nearly **$9.8 million for the Sunrise Defendants alone**.

200.    There are significant additional damages due to false claims by the Pharmacies, Homecare Agencies and individual defendants.

201.    Furthermore, Relator has reason to believe that the scheme is much larger than the Defendants alone. Rather, the scheme is similar if not identical in the entire Korean adult daycare community.    Evidence for this belief includes:

    a.    Lee previously worked at other adult daycares where he obtained the knowledge to implement this scheme at Sunrise; and

    b.    Members often switch which daycare they enroll in depending on the amount of kickbacks they receive.

## V.    CONCLUSION

202.    Defendants engaged in knowing schemes to receive and retain Government funds without using them to benefit beneficiaries' health care as well as to seek reimbursement for

41

services not provided, improperly provided services and services that were of such poor quality that they amounted to services not rendered and resulted in harm to the recipients of those services. Consequently, Defendants received Medicare and Medicaid payments that they are not entitled to in violation of the FCA and NY FCA.

## FIRST CAUSE OF ACTION
## VIOLATION OF FEDERAL FALSE CLAIMS ACT

203. Relator incorporates herein by reference the preceding paragraphs as though fully set forth herein.

204. This is a civil action brought by Relator, on behalf of the United States of America, against Defendants under the federal False Claims Act, 31 U.S.C. § 3729(a)(1), (2).

205. Defendants knowingly presented, and/or caused to be presented claims for payment for daycare services, home health aide services, physician services, and prescriptions which were not provided or not medically necessary.

206. The claims Defendants submitted to Medicare or Medicaid for daycare services, home health aide services, physician services, and prescriptions which were not provided or medically necessary were false claims submitted in violation of the FCA. Defendants knew, or acted in reckless disregard, that they were ineligible for the payments demanded due to the fact that the daycare services, home health aide services, physician services, and prescriptions were not provided or not medically necessary.

207. Claims submitted by Defendants to federally-funded health insurance programs (including Medicare and Medicaid) for daycare services, home health aide services, physician services, and prescriptions were not provided or not medically necessary constitute violations of the federal False Claims Act, 31 U.S.C. § 372(a)(1).

208. Defendants, through their concerted efforts to carry out their systematic scheme to

42

obtain fraudulent payments from Medicare or Medicaid, caused to be made or used false records or statements to get false or fraudulent payments in violation of the federal False Claims Act, 31 U.S.C. § 372(a)(1).

209.    All of Defendants' conduct described in the Complaint was knowing, as that term is used in the federal False Claims Act.

## SECOND CAUSE OF ACTION
## NEW YORK FALSE CLAIMS ACT

210.    Relator incorporates herein by reference the preceding paragraphs as though fully set forth herein.

211.    This is a civil action brought by Relator, on behalf of the State of New York, against Defendants under the New York False Claims Act, N.Y. State Fin. Law § 187, *et seq.*

212.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented a false or fraudulent claim for payment or approval to the State of New York, the City of New York and/or other state or local government agencies, in violation of N.Y. State Fin. Law § 189(1)(a).

213.    The claims Defendants submitted to Medicare or Medicaid for daycare services, home health aide services, physician services, and prescriptions were not provided or not medically necessary were false claims submitted in violation of the NYFCA § 189(1)(a). Defendants knew, or acted in reckless disregard, that they were ineligible for the payments demanded due to the fact that the physician exams were not subjected to a proper order or referral.

214.    Claims submitted by Defendants to federally-funded health insurance programs (including Medicare or Medicaid) for daycare services, home health aide services, physician

43

services, and prescriptions were not provided or not medically necessary constitute violations of the NYFCA.

215.    Defendants, through their concerted efforts to carry out their systematic scheme to obtain fraudulent payments to Medicare or Medicaid, caused to be made or used false records or statements to get false or fraudulent payments in violation of the NY FCA.

216.    As a result of Defendants' actions, set forth above, the state of New York, the city of New York and/or other state and local government agencies have been and continue to be severely damaged.

## PRAYER FOR RELIEF

Wherefore, the United Stated of America and State of New York ex rel Dong in Kang respectfully requests that this Court grant the following relief:

a.    That Defendants be ordered to cease and desist for submitting or causing to be submitted any more false claims;

b.    That judgment be entered in Relator's favor and against Defendants in the amount equal to three (3) times the amount of damages sustained by the United States as a result of Defendants' actions;

c.    A civil penalty of $11,000 for each violation of the federal False Claims Act.

d.    25% of the proceeds in this action if the United States elects to intervene, and 30% of the proceeds of this action if the United States elects not to intervene;

e.    That judgment be entered in Relator's favor and against Defendants in the amount equal to three (3) times the amount of damages sustained by the State and local governments of New York plus a penalty of not less than six thousand dollars

($6,000) and not more than twelve thousand dollars ($12,000) as provided by NY Fin. Law §§ 187, *et seq.*;

f.   That Relator be awarded the maximum allowed pursuant to NY Fin. Law §§ 187, *et seq.*(i.e., 25% if the State of New York elects to intervene, and 30% if it does not);

g.   That Relator be awarded all damages available pursuant to 31 U.S.C. § 3730(h) as a result of Defendants' retaliation against them, including but not limited to compensation for any special damages as a result of the harassment, including damages for emotional distress;

h.   An award of Relator's costs and expenses of this action together with Relators' attorneys' and expert fees; and

i.   Such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Relator hereby demands a trial by jury on all questions of fact raised by the Complaint.

Dated:  New York, New York
        January 27, 2022

PELTON GRAHAM LLC

By: _____.
Brent E. Pelton (BP 1055)
Taylor B. Graham (TG 9607)
Alison L. Mangiatordi (AL 1020)
111 Broadway, Suite 1503
New York, New York 10006
Telephone: (212) 385-9700
Facsimile: (212) 385-0800

*Attorneys for Relator*

45